**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JEFFERY SHAW,

                       Petitioner,                      Case Number: 2:02-CV-70870

v.                                             HON. ARTHUR J. TARNOW

PAUL RENICO,

                       Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY IN PART

      Petitioner Jeffery Shaw, currently incarcerated at the Chippewa Correctional Facility in Kincheloe, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his convictions for three counts of assault with intent to do great bodily harm less than murder and three counts of felony firearm.  For the reasons set forth below, the Court denies the petition.

### I.  Facts

      Petitioner's convictions relate to the shooting of a high-powered rifle at vehicles traveling past his home on Getty Street in the City of Muskegon on November 10, 1998.

      David Gassman testified that he was driving on Getty Street on the evening of November 10, 1998, when he heard a loud bang and observed a hole in his front windshield.  He later realized that his back windshield had been completely blown out.  He then drove to a Domino's Pizza and the police were called.

      Muskegon Police Officer Geraldine Stephan testified that, on November 10, 1998, at approximately 8:00 p.m., she responded to a call about a vehicle that had been shot at on Getty

*Shaw v Renico,* 02-70870

Street.  She interviewed Carla Redmon who stated that she had been driving on Getty Street with her two young sons when she heard a loud bang.  Her son appeared to have been grazed by a bullet on the top of his head.  Officer Stephan testified that she saw what appeared to be a bullet hole on the rear of the vehicle.  After interviewing Redmon, Officer Stephan responded to a call of shots being fired at a home less than a mile away on Marquette Street.  She arrived at the home at approximately 8:45 p.m.  Once at the home, she interviewed the homeowner, Winford Morrisey, who showed her a bullet hole in his dining room window and another in a bathroom door.  He also showed her a bullet he recovered from the floor of the bathroom.

Officer Stephan was then dispatched to Domino's Pizza to take a report about another vehicle at which shots had been fired.  She interviewed David Gassman.  She then went to the home of Floyd Elliot, who reported that he had been driving on Getty when a shot was fired at his vehicle.  The rear window and driver's side windows of his car were shattered.  As Officer Stephan was interviewing Elliott, she heard four or five gunshots.  She looked in the direction of 840 Getty Street.  She saw an open upstairs window, which was notable because it was cold outside.  As she observed the home, she heard several more shots and saw a muzzle flash in a downstairs window.

The Michigan State Police SWAT team was called to the scene.  State trooper Richard Janes testified that he responded to 840 Getty on the day of the shootings.  After the SWAT team failed to convince Petitioner to leave the house, tear gas was shot into the house.  Petitioner did not exit the house.  Police then entered the home and found Petitioner in a sleeping bag on the kitchen floor with blood underneath him.  Petitioner's wrists had been slashed.

2

*Shaw v Renico,* 02-70870

Detective John Corrigan testified that he entered the home at 840 Getty after Petitioner had been removed.  He identified several rifles found in the house and a large number of casings and cartridges.  Detective Corrigan testified that several weapons, including one with a scope, and a fired cartridge casing were found in an upstairs bedroom near a window.

Police detective Orlando Riley testified that he interviewed Petitioner at the hospital on the morning after the shootings.  He interviewed Petitioner after his wrists had been stitched by the emergency room physician.  Before interviewing Petitioner, Detective Riley's partner advised Petitioner of his *Miranda* rights.  Detective Riley testified that Petitioner indicated he would like to talk to him and his partner.  Petitioner told Detective Riley that, on the day of the shooting, he had been drinking with his brother in his home.  He stated that he was upset about something that had happened in court earlier in the day.  He denied knowing anything about the shootings that occurred.

Detective Riley testified that he also interviewed Petitioner's brother, David Shaw, on the day after the shootings.  David Shaw lived with his brother at 840 Getty.  Detective Riley testified that David Shaw told him he heard gunshots coming from upstairs on November 10, 1998, and that he saw Petitioner firing a rifle out the upstairs window.

David Shaw testified and denied telling Detective Riley that he heard gunshots or saw his brother firing a gun on that date.

Petitioner did not testify.

3

*Shaw v Renico,* 02-70870

## II. Procedural History

Petitioner was charged with four counts each of assault with intent to murder and felony firearm. Following a jury trial in Muskegon County Circuit Court, Petitioner was convicted of three counts of assault with intent to do great bodily harm less than murder, and three counts of possession of a firearm during the commission of a felony. He was acquitted of one count of assault with intent to do great bodily harm and one count of felony firearm. On September 30, 1999, he was sentenced as a second habitual offender, to three concurrent terms of nine to fifteen years in prison for the assault convictions, to be served consecutively to three concurrent terms of two-years in prison for the felony-firearm convictions.

Petitioner filed an appeal of right in the Michigan Court of Appeals, presenting the following claims:

I.    Did the trial court err by denying defendant's motion for a directed verdict on assault with intent to murder?

II.   Was sufficient evidence presented to convict defendant of assault with intent to do great bodily harm?

III.  Did the trial court err reversibly by informing the jury that it could not have a transcript of the trial, thus foreclosing the possibility of rereading testimony if it became necessary?

IV.   Did the trial court err reversibly by considering the report of the center for forensic psychiatry on criminal responsibility in determining that defendant's statements to police were made voluntarily?

V.    Did the trial court abuse its discretion by sustaining plaintiff's objection to the presentation of evidence showing that a description and photograph of defendant appeared in the local newspaper before Susan Berghuis identified the defendant in a lineup?

4

*Shaw v Renico*, 02-70870

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Shaw*, No. 222908 (Mich. Ct. App. June 15, 2001).

Petitioner filed a delayed application for leave to appeal to the Michigan Supreme Court, presenting the following issues:

I.    Convictions were obtained pursuant to an illegal arrest where mere suspicion was relied upon in lieu of probable cause.

II.   Convictions were obtained by violation of my Fifth Amendment privilege against self-incrimination where the lawful refusal to acquiesce to unreasonable police orders and my compelled action subsequent to the use of excessive force to effect the arrest were unfairly presented as evidence of a guilty mind.

III.  Convictions were obtained by use of "staged" photographic evidence.

IV.   Convictions were obtained pursuant to malicious prosecution.

V.    Convictions were obtained pursuant to improper admission of evidence from a set of manufactured 404-B charges.

VI.   The lineup procedure was extremely suggestive.

VII.  Convictions were obtained as a result of ineffective assistance of counsel.

VIII. Convictions were obtained pursuant to deliberate violation of defendant's right to due process by the performance of an abuse of custody designed to prevent his exercise of the right to testify and/or conduct the proper supervision of defense counsel.

IX.   Convictions were obtained as a result of prosecution's failure to disclose exculpatory evidence.

X.    Convictions were affirmed as a result of ineffective appellate counsel.

XI.   I am asking the court to consider newly discovered evidence regarding the falsity of the 404-B incident that I allege was fabricated to produce the only identification witness.

5

*Shaw v Renico,* 02-70870

XII.    Convictions were obtained as a result of a sham trial.  The cumulative effect of the issues demonstrate a deliberate miscarriage of justice.

The Michigan Supreme Court denied leave to appeal.  *People v. Shaw*, 456 Mich. 953 (Mich. Feb. 4, 2002).

On or about December 8, 1999, Petitioner filed a petition for a writ of habeas corpus in this Court, claiming that his convictions are unconstitutional because: (1) his convictions were obtained pursuant to evidence gained through an illegal search and seizure; (2) evidence was obtained through an illegal arrest; (3) his right or privilege against self-incrimination was violated; (4) the prosecution failed to divulge exculpatory evidence; and (5) "staged" evidence was used to convict.  This Court dismissed the petition without prejudice because Petitioner failed to exhaust his state court remedies in accordance with 28 U.S.C. § 2254(b), where his direct appeal was still pending in state court.

On February 13, 2002, Petitioner filed another petition for a writ of habeas corpus, presenting the following claim for relief:

Conviction obtained by the knowing use of false evidence.

This Court dismissed this petition for failing to exhaust state court remedies, as Petitioner had only raised this issue with Michigan Supreme Court and not with the Michigan Court of Appeals.

After filing a motion for relief from judgment in the trial court and appealing the denial of that motion to both state appellate courts, Petitioner moved to reopen his habeas corpus proceeding.  The Court granted the motion to reopen and Petitioner filed an amended habeas petition, raising the following claims:

6

*Shaw v Renico,* 02-70870

I.      Were Petitioner's convictions obtained by malicious prosecution where mere suspicion was relied upon in lieu of probable cause in violation of defendant's Fourth and Fourteenth Amendment rights?

II.     Were Petitioner's convictions obtained by unconstitutional violation of Fifth Amendment privilege against self-incrimination?

III.    Were Petitioner's convictions obtained by ineffective assistance of defense counsel who possessed gross conflict of interest violative of Petitioner's Sixth Amendment right to counsel?

IV.     Were Petitioner's convictions obtained by denial of right to testify on one's behalf in violation of Petitioner's Sixth Amendment right?

V.      Were Petitioner's convictions obtained by knowing use of manufactured evidence in violation of the Fourteenth Amendment?

VI.     Were Petitioner's convictions affirmed as result of ineffective assistance of appellate counsel?

The Court granted Petitioner's request for an evidentiary hearing regarding Petitioner's

ineffective assistance of trial and appellate counsel claims.  An evidentiary hearing was held on

September 16, 2010.

### III.  Standard of Review

Section 2254(d) of Title 28 U.S.C., imposes the following standard of review for habeas

cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

*Shaw v Renico,* 02-70870

(2)     resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
        State court proceedings.

28 U.S.C. § 2254(d).  Additionally, this Court must presume the correctness of state court factual

determinations.  28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state

court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law

or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable

application occurs" when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case."  *Id.* at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly.  Rather, that

application must also be unreasonable."  *Id.* at 410-11.

"A state court's determination that a claim lacks merit precludes federal habeas relief so

long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 789 (2011), *quoting Yarborough v. Alvarado*,

541 U.S. 652, 664 (2004).  "Section 2254(d) reflects the view that habeas corpus is a guard

against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary

error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal

court, a state prisoner must show that the state court's ruling on the claim being presented in

federal court was so lacking in justification that there was an error well understood and

8

*Shaw v Renico,* 02-70870

comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

## IV.  Discussion

### A.  Procedural Default

Respondent contends that Petitioner's claims are procedurally defaulted.  "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), *citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).  "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525.  In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of these claims.

### B.  Fourth Amendment Claim

In his first claim for habeas corpus, Petitioner argues that the search warrant and supporting affidavit were not supported by probable cause.

The Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." *Stone v. Powell*, 428 U.S. 465, 494-95 (1976). The Sixth Circuit Court of Appeals utilizes a two-step analysis to determine whether a defendant was given a full and fair opportunity to litigate a Fourth Amendment claim in state court:

9

*Shaw v Renico,* 02-70870

> First, the court must determine whether the state procedural mechanism, in the
> abstract, presents the opportunity to raise a fourth amendment claim.  Second, the
> court must determine whether presentation of the claim was in fact frustrated
> because of a failure of that mechanism.

*Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000) (internal quotations omitted).

"Michigan has a procedural mechanism which presents an adequate opportunity for a criminal defendant to raise a Fourth Amendment claim."  *Robinson v. Jackson*, 366 F.Supp.2d 524, 527 (E.D. Mich. 2005).  This procedural mechanism is a motion to suppress, ordinarily filed before trial.  *See People v. Ferguson*, 376 Mich. 90, 135 N.W.2d 357, 358-59 (Mich. 1965) (describing the availability of a pre-trial motion to suppress).  Because Michigan provides a procedural mechanism for raising a Fourth Amendment claim, Petitioner may only demonstrate entitlement to relief if he establishes that presentation of his claim was frustrated by a failure of that mechanism.  This he has not done.

Petitioner raised the search and seizure issue prior to trial.  The trial court denied the motion to suppress.  Petitioner did not pursue this issue on direct appeal, but raised it again in his motion for relief from judgment. The trial court determined that Petitioner was not entitled to relief.  The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal.

Petitioner was provided an opportunity for full and fair litigation of his Fourth Amendment claim in the Michigan courts.  Petitioner's disagreement with the state courts' conclusions on his Fourth Amendment claim does not render the state's procedural mechanism inadequate.  Therefore, Petitioner's Fourth Amendment claim is barred by the rule in *Stone v. Powell*.

*Shaw v Renico,* 02-70870

## C.  Privilege Against Self-Incrimination

Petitioner argues that his custodial statement taken while he was hospitalized was obtained in violation of his right to be free from compelled self-incrimination.  He further argues that his right to be free from compelled self-incrimination was violated because the prosecution was permitted to admit evidence about his conduct during the siege.

The Fifth Amendment provides that "[n]o person shall be . . . .compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, to protect a suspect's Fifth Amendment rights, an individual who has been taken into custody or otherwise deprived of his freedom and is questioned must be advised, prior to any questioning, "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him."  *Id.* at 478-79.  A defendant may waive the rights conveyed by the *Miranda* warnings, provided that the waiver is made voluntarily, knowingly and intelligently.  *Id.* at 475.

The inquiry whether a waiver is coerced "has two distinct dimensions."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

> First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id*. (internal quotation omitted).

11

*Shaw v Renico,* 02-70870

Petitioner challenged the admissibility of the custodial statement on the ground that it was involuntary. An evidentiary hearing was conducted by the trial court pursuant to *People v. Walker*, 374 Mich. 331 (1965).

At the *Walker* hearing, two police officers and Petitioner testified. Police Officer Orlando Riley testified that he interviewed Petitioner at the hospital on November 11, 1998. Officer Riley observed Petitioner being attended to by doctors. After Petitioner's wrists were stitched, Officer Riley determined that general anesthesia had not been administered. Officer Riley interviewed Petitioner shortly after the doctor finished attending to him, and spoke to Petitioner for approximately twenty minutes, beginning at approximately 10:00 a.m. Before the interview commenced, Sergeant Dean Roesler advised Petitioner of his *Miranda* rights. Officer Riley testified that Petitioner appeared coherent, alert, and cognizant of what was going on around him. He did not appear to be intoxicated and a blood alcohol test from a sample taken when the interview concluded showed zero blood alcohol level. A toxicology report showed the presence of lidocaine in Petitioner's blood. After being read his rights, Petitioner agreed to speak to police.

Petitioner told officers that on the night of November 10, he had been drinking in his home. He was in the home with his brother, William David Shaw. He admitted to being upset about a court proceeding that had taken place earlier in the day. Petitioner denied having any knowledge of shots being fired in the area of 840 Getty. Throughout the interview, Petitioner responded with coherence to questions. Petitioner was discharged from the hospital very shortly after the interrogation ended. Officer Riley testified that Petitioner was in the home for

12

*Shaw v Renico,* 02-70870

approximately twelve hours while the home was surrounded by law enforcement officers. A police officer was stationed outside Petitioner's cubicle in the emergency room.

Police Officer Dean Roesler testified that he participated in questioning Petitioner. Officer Roesler testified that Petitioner appeared lucid and appeared to understand his rights. Officer Roesler testified that within an hour after questioning ended Petitioner was released from the hospital.

Petitioner then testified at the *Walker* hearing. He testified that toward the end of the standoff at his home, he slit his wrists. When it became apparent that insufficient blood was flowing from his wrists, he slit his arm further up. He has received mental health treatment in the past and been diagnosed with various mental illnesses including bipolar disorder and hypochondriasis. He testified that, when Officers Riley and Roesler questioned him at the hospital, he was secured to the bed by nylon restraints. He described feeling confused at the time. At the same time, he also testified that he had extensive experience with the criminal justice system having been arrested and advised of his rights over a half-dozen times. He admitted that he understood the rights read to him by Officer Riley, that he understood he had a right to an attorney but decided to talk to the officers anyway.

Following the *Walker* hearing the trial court held that Petitioner's statement was voluntary. The trial court relied on the following considerations in reaching this decision: Petitioner was awake, lucid and understood the questions; he did not have slurred speech, had no blood alcohol content, and the treating physician gave officers permission to question Petitioner. Further, the trial court found that Petitioner, although testifying that he suffered from mental

13

*Shaw v Renico,* 02-70870

illness, evidenced rational decision making throughout the standoff and at the hospital. Petitioner decided to continue the interrogation with police officers because he thought he might be able to resolve the situation and wanted information from the police officers.

The Court finds that the state court's conclusions are supported by the record and not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also argues that his right to be free from compelled self-incrimination was violated because the prosecution was permitted to admit evidence about his conduct during the siege, when he had not yet been advised of his *Miranda* rights. Petitioner maintains that his conduct during the siege was indicative of post-traumatic stress disorder and not of a culpable state of mind.

The *Miranda* safeguards "come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). In *Unites States v. Mesa*, 638 F.2d 582 (3d Cir. 1980), the Third Circuit Court of Appeals considered whether an armed individual who had barricaded himself in a motel room away from police is "in custody." The Third Circuit held that, because the individual could prevent "law enforcement officials from exercising immediate control over his actions" he was not "in custody." *Id.* at 586. Other courts have held that individuals in similar police standoff situations were not in custody for purposes of *Miranda*. *United States v. Kelly*, 2008 WL 5382272, *7 (D. Minn. Dec. 23, 2008) (holding that a defendant who was holed up in his home with guns and ammunition, resisting federal agents' requests that he surrender, was not "in custody"); *Manzella v. Senkowski*, 2004 WL 1498195, * 24-26 (W.D. N.Y. July 2, 2004)

14

*Shaw v Renico,* 02-70870

(collecting state and federal cases finding that individual barricaded in home or other location surrounding by police did not satisfy *Miranda's* in custody requirement).

In this case, "fair-minded jurists could disagree" over whether Petitioner was in custody. *Id.* The Supreme Court has held that, where certain facts support a finding that a defendant was in custody and certain other facts support a contrary finding, a state court's decision to admit evidence is not contrary to clearly established law because "fair-minded jurists could disagree" over the custody determination. *Id.* The Court cannot say that the decision to admit this evidence falls outside the matrix of the Supreme Court's decisions governing the custody issue. Therefore, habeas relief is denied.

### D. Alleged Ineffective Assistance of Counsel

Petitioner argues that he received ineffective assistance of counsel because his retained trial attorney operated under a gross conflict of interest. The alleged conflict derives from trial counsel's prior position as an assistant prosecuting attorney for Muskegon County.

A criminal defendant is entitled to the effective assistance of counsel free from conflict. *Holloway v. Arkansas*, 435 U.S. 475, 483-84 (1978). The Sixth Circuit has summarized the difference between the typical ineffective assistance of counsel claim and a claim based on an allegation that counsel was burdened by a conflict of interest as follows:

> Conflict of interest cases involve a slightly different standard than that used in traditional ineffectiveness claims. *See* [*Thomas v. Foltz,* 818 F.2d 476, 480 (1987).] Where there is conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052. Thus, when an actual conflict of interest exists, prejudice is presumed. *See id.* Prejudice is presumed, however, "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Cuyler v.*

15

*Shaw v Renico,* 02-70870

*Sullivan*, 446 U.S. 335, 345-50, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).  Thus, while the rule is rigid, it is not a *per se* rule. *See id.*

*United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000).

In short, cases involving an actual conflict of interest have a lessened standard of proof because prejudice will be presumed upon a showing that a conflict existed which adversely affected counsel's performance.  However, *Cuyler*'s lessened standard of proof has never been extended by the United States Supreme Court to any conflict other than joint representation. *Smith v. Hofbauer*, 312 F.3d 809, 818 (6th Cir. 2002).  *Cuyler*'s presumed prejudice standard for ineffectiveness claims based on a conflict of interest is inapplicable to cases of successive representation.  *Lordi v. Ishee*, 384 F.3d 189 (6th Cir. 2004).  The instant case does not involve joint representation. Thus, *Strickland* is the proper standard for determining whether counsel's alleged conflict of interest rendered his performance constitutionally deficient.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel.  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "Judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has]

16

*Shaw v Renico,* 02-70870

emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotes omitted)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1485 (2010).

> [T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-90. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . . The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___,

*Shaw v Renico,* 02-70870

129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S.Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. at 788.

In this case, the state court did not address the merits of Petitioner's claims because it held that they were barred by state procedural rules.  Where the state court has altogether failed to review a particular claim, such a claim is reviewed *de novo*.  Where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer."  *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  In such circumstances, the court conducts a *de novo* review.  *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

Petitioner alleges that trial counsel, Shawn Davis, operated under a conflict of interest because, shortly before being retained by Petitioner, Davis was a senior assistant prosecuting attorney for Muskegon County, and was involved in developing the state's case against Petitioner.  As proof of Davis's personal involvement in Petitioner's case, Petitioner attaches a letter dated February 7, 1999, from his assigned attorney to Davis, requesting that Davis provide a copy of statements related to Petitioner's case.

18

*Shaw v Renico,* 02-70870

Petitioner argues that Davis's conflict of interest caused Davis to abandon the promised defense strategy of attacking evidence related to another shooting incident from an overpass earlier in the day ("the 404(b) evidence") in favor of attacking the sufficiency of the evidence. Petitioner maintains that attacking the 404(b) evidence would have provided a much stronger defense because substantial evidence proving the 404(b) case was manufactured was available during trial.

During the evidentiary hearing in this Court, Davis testified that he was employed at the Muskegon County Prosecutor's Office prior to representing Petitioner. He testified that, while employed as a prosecutor, he had no contact with Petitioner's case. Davis did not know why Petitioner's court-appointed attorney would have sent him a letter requesting documents related to Petitioner's case. The Court found Davis's testimony in this regard to be credible.

Petitioner testified that he selected Shawn Davis as defense counsel because he was aware that he was formerly employed by the prosecutor's office and that he was someone the prosecutors feared. He thought he was hiring his "enemy's enemy" when he hired Davis, "a good arrangement for [him]." Tr., 9/16/10 at 13.

The trial court held a hearing to determine whether the other act evidence was admissible under Michigan Rule of Evidence 404(b). During the hearing, Davis argued vigorously for the exclusion of this evidence. He argued that the 404(b) case was clearly distinguishable factually from the Getty Street case, admission of evidence regarding the 404(b) case would confuse the jury, and, because identification was an issue in that case, result in a trial within a trial. Davis argued that the only purpose for admitting the Marquette Street incident was to show Petitioner's

19

*Shaw v Renico,* 02-70870

inclination to wrongdoing to prove that he committed the Getty Street shootings. The trial court judge deemed the evidence admissible.

At trial, Davis cross-examined Berghuis extensively. He highlighted inconsistencies between her description of the suspect on the day of the incident and her later descriptions fo him. Counsel also highlighted how her description of the individual evolved over time to become more consistent with Petitioner's physical appearance. There is no indication that Shaw failed to challenge the 404(b) evidence, either at the hearing on its admissibility or at trial. Petitioner fails to specify any particular questions or additional evidence related to the 404(b) evidence counsel should have raised.

The Court holds that there was no actual conflict of interest in this case and that Petitioner has failed to show that counsel was ineffective or that he was prejudiced by counsel's conduct.

### E.  Right to Testify

Petitioner next asserts that habeas is warranted because he was denied his right to testify in his own defense. It is well-established that a criminal defendant has a constitutional right to testify in his own behalf. *See Rock v. Arkansas*, 483 U.S. 44, 52-53 & n. 10 (1987); *Neuman v. Rivers*, 125 F.3d 315, 318 (6th Cir.1997).

When a tactical decision is made by an attorney that a defendant should not testify, the defendant's assent is presumed. *Gonzales v. Elo*, 233 F. 3d 348, 357 (6th Cir. 2000). A trial court has no duty to inquire *sua sponte* whether a defendant knowingly, voluntarily, or intelligently waives his right to testify. *United States v. Webber*, 208 F. 3d 545, 551-52 (6th Cir.

20

*Shaw v Renico,* 02-70870

2000).  In addition, a state trial judge is not constitutionally required to specifically address a criminal defendant and both explain that he has a right to testify and ask him whether he wishes to waive that right.  *Siciliano v. Vose*, 834 F. 2d 29, 30 (1st Cir. 1987).  Waiver of the right to testify may be inferred from a defendant's conduct.  Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.  *Webber,* 208 F. 3d at 551.  Here, Petitioner did not alert the trial court at the time of trial that he wanted to testify.  Thus, his failure to do so constitutes a waiver of this right.  *Id.*

Moreover, Petitioner briefly testified in this Court that he was not permitted to testify at trial.  The Court found this testimony not to be credible and insufficient to overcome the presumption that he willingly agreed to counsel's advice not to testify.

Additionally, the Court finds incredible Petitioner's allegations that the trial court, prosecutor, and defense counsel conspired to deny him his right to testify.  Among other allegations, Petitioner argues that on the eve of the final day of trial he was placed in a high security jail cell where he was unable to fall asleep.  He claims his placement there and resulting fatigue were designed "to effectively diminish [his] capacity to exercise supervisory role over conflicted defense counsel."  Petition at 19.  Petitioner's allegations are conclusory and he failed to provide any credible support for them at the evidentiary hearing.

### F.  Manufactured Evidence Claim

Petitioner claims that habeas relief should be granted because his convictions were obtained by the knowing use of manufactured evidence.  He argues that a 911 call made by Sue Berghuis in connection with the 404(b) case was manufactured by police.  Petitioner bases this

*Shaw v Renico,* 02-70870

argument on apparent discrepancies between the audio tape of the call and the transcript of the call.  This claim is not supported by the record and no facts were developed at the evidentiary hearing to show that manufactured evidence was presented at trial.

### G.  Ineffective Assistance of Appellate Counsel

Finally, Petitioner alleges ineffective assistance of appellate counsel as cause to excuse his procedural default.  As discussed above, the Court determined that the interests of judicial economy were best served by the Court's addressing the merits of Petitioner's defaulted claims.  Nevertheless, the Court will briefly address Petitioner's ineffective assistance of appellate counsel claim.

Petitioner claims that appellate counsel was ineffective in failing to raise on direct review the claims Petitioner raised on collateral review and in his habeas petition.  Petitioner has failed to show that any of these claims were potentially meritorious.  Therefore, Petitioner cannot show that his appellate attorney was ineffective for failing to raise them on direct appeal.

### V.  Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11, Rules Governing Section 2255 Proceedings.

22

*Shaw v Renico,* 02-70870

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).  To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotes and citations omitted).

The Court finds that reasonable jurists could find its resolution of the Fifth Amendment self-incrimination and ineffective assistance of counsel claims to be debatable or wrong. Accordingly, the Court will grant a certificate of appealability on these claims.

With respect to the remaining claims, the Court finds that reasonable jurists would not debate that this Court correctly denied each of these claims.  Therefore, the Court will deny a certificate of appealability on the remaining claims.

*Shaw v Renico,* 02-70870

## VI.  Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED** and the

matter is **DISMISSED WITH PREJUDICE.**

A certificate of appealability is **GRANTED** for Petitioner's Fifth Amendment self-

incrimination and ineffective assistance of counsel claims.

**SO ORDERED**.


S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: February 28, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on
February 28, 2011, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary

24